UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN WELL CORPORATION, )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>METRO HEALTH, INC. d/b/a )<br>METROHEALTH DC and LCA VANTAGE )<br>HEALTHCARE CORP. d/b/a PARKER )<br>HEALTH, )<br>)<br>Defendants. )<br>) | Civil Action No. 24-cv-12820-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**            July 1, 2025

### I. Introduction

Plaintiff American Well Corporation ("Amwell") has filed this lawsuit against Defendants Metro Health Inc. d/b/a MetroHealth DC ("Metro Health") and LCA Vantage Healthcare Corp. d/b/a Parker Health ("LCA Vantage") alleging two claims of breach of contract (Count I and Count II). D. 1, 14. Metro Health has now moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). D. 15. For the reasons stated below, the Court ALLOWS the motion to dismiss the complaint as to Count I but DENIES the motion as to Count II.

### II. Standards of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific

1

inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. Id. Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted). In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (citation omitted).

### III.  Factual Background

The following facts are drawn from Amwell's amended complaint, D. 14, and attached exhibits, and are accepted as true for the purposes of resolving Metro Health's motion to dismiss, D. 15.

#### A.  Quotation # Q-07772-2

On or about December 20, 2022, Amwell and Metro Health entered into an agreement referred to as "Quotation # Q-07772-2," pursuant to which Amwell would provide its "Amwell Quick Connect" product and associated provisioning and training to Metro Health for a thirty-six month term. D. 14 ¶ 14; D. 14-1. Quotation # Q-07772-2 was signed and executed by Metro Health on December 19, 2022 and by Amwell the next day. D. 14 ¶¶ 16-17; D. 14-1 at 4. Under the Quotation's terms, Metro Health was to pay Amwell a total of $41,000, to be invoiced annually on the anniversary of the execution date and with the first-year annual fee to be paid upon execution. D. 14 ¶ 19; D. 14-1 at 3. This also includes a $5,000 training and provisioning fee to be paid also upon the execution date. D. 14-1 at 2.

On January 30, 2023, Amwell issued Invoice # INV63221A to Metro Health in the amount of $41,000, containing the charges and consideration related to the provision of Amwell Connect

pursuant to Quotation #Q-07772-2.  D. 14 ¶ 23; D. 14-3 at 2.  As alleged, pursuant to an agreement for funding between Metro Health and the Federal Communications Commission (the "FCC"), the FCC agreed to pay 85% of the invoice amount if Metro Health was willing to pay 15% of same, thereby reducing the amount owed by Metro Health in connection with the invoice to $6,150.  D. 14 ¶ 26.  The FCC paid its 85% contribution, $34,850.00 to Amwell, id.; D. 14-3 at 2, but Metro Health has failed to pay any its 15% share of its agreement with the FCC or any amount as to Invoice # INV63221A.  D. 14 ¶ 27.  As a result, the FCC has allegedly decommitted its funding for Metro Health and made no further payments on Metro Health's behalf in connection with Invoice # INV63221A or any subsequent invoice.  Id. ¶ 28.

        **B.**      **Master Software and Services Agreement**

On or about March 2, 2023, Amwell and Metro Health entered into a Master Software and Services Agreement ("MSA").  D. 14 ¶ 29; D. 14-4.  Pursuant to the MSA, Amwell would provide further access to certain services on Amwell's telehealth platform to Metro Health on a non-exclusive, nontransferable basis.  D. 14 ¶ 29.  The MSA was signed and executed by Metro Health on March 1, 2023 and by Amwell the next day.  D. 14 ¶ 31-32; D. 14-4 at 6.  The MSA incorporates "Ordering Documents," which are defined to include quotations, statements of work, and other order forms that incorporate the MSA by reference.  D. 14 ¶ 33; D. 14-4 at 2.  Under Section 5 of the MSA, Metro Health agreed to pay Amwell pursuant to the terms of those Ordering Documents.  D. 14 ¶ 34; D. 14-4 at 3.

        **C.**      **Quotation # Q-08499-1**

On or about May 4, 2023, Amwell and Metro Health entered into an agreement referred to as Quotation # Q-08499-1, pursuant to which Amwell provided Metro Health with (1) the setup of an "Automated Care Program" and (2) a "Chronic Care Program" for Diabetes Type 2, for a two-year term beginning on May 3, 2023.  D. 14 ¶ 36; D. 14-5.  Quotation # Q-08499-1 was

3

executed by Metro Health on May 3, 2023 and by Amwell the next day. D. 14 ¶ 38-39; D. 14-5 at 5. Under this agreement, Metro Health was to pay a total of $245,000 in consideration for the Automated Care Program and Chronic Care Program products, with the first-year fees being $140,000. D. 14 ¶ 40; D. 14-5 at 3. Annual fees were to be invoiced on the anniversary of the execution date, with the first-year annual fee to be paid upon execution. D. 14 ¶ 41; D. 14-5 at 4.

On May 31, 2023, Amwell issued Invoice # INV64728 to Metro Health in the amount of $140,000 containing the first-year charges (for the period of May 4, 2023 to May 3, 2024) related to the setup of an "Automated Care Program" and the provision of Amwell's "Chronic Care Program" for Diabetes Type 2 pursuant to this Quotation. D. 14 ¶ 45; D.14-6. On August 1, 2024, Amwell issued Invoice # INV66450 to Metro Health in the amount of $105,000 containing the second-year charges (for the period from May 4, 2024 to May 3, 2025). D. 14 ¶ 49; D. 14-7. To date, Metro Health has failed to make any payment in connection with either invoice. D. 14 ¶¶ 48, 52.

### D.    Amwell's Collection Attempts

In or around April 2024, Metro Health was acquired by LCA Vantage.[1] D. 14 ¶ 55. On May 21, 2024, Amwell sent a Notice of Material Breach and Immediate Demand for Payment letter to Metro Health, putting the company on notice of its material breach of the MSA, Quotation # Q-07772-2 and Quotation # Q-08499-1. D. 14 ¶ 58; D. 14-8. Amwell demanded payment of the outstanding balance on or before June 20, 2024. Id.; D. 14-8 at 3.

On June 27, 2024, representatives of Amwell met with Vincent Lopez ("Lopez"), the Chairman and CEO of LCA Vantage/Parker Health. Id. ¶ 59. During the meeting, Lopez allegedly informed Amwell that the former leadership of Metro Health had engaged in fraudulent activities

---

[1] Metro Health notes that it brings the motion to dismiss on its own behalf and not on behalf of co-Defendant LCA Vantage. D. 16 at 4 n. 1.

at the company, which included apportioning the funds that were intended to pay Amwell's invoices for their own personal use. Id. Lopez, on behalf of LCA Vantage, offered to enter into a payment plan pursuant to which it would pay the outstanding balances over a period of time to avoid termination of the MSA and the Quotations. Id. ¶ 60. Amwell agreed to the offer. Id. ¶ 61. Since then, Metro Health and LCA Vantage has allegedly ignored months of communications and efforts by Amwell to re-engage them for payment. Id. On September 12, 2024, Amwell sent a letter to Lopez providing a formal notice of termination of the MSA and the Quotations effective September 30, 2024. Id. ¶ 62. To date, Metro Health and LCA Vantage have failed to pay Amwell for the products and services provided under the MSA or the Quotations. Id. ¶ 63.

### IV.  Procedural History

On November 12, 2024, Amwell filed its original complaint against Metro Health and LCA Vantage. D. 1. Metro Health moved to dismiss this complaint.[2] D. 10. Amwell then filed an amended complaint, D. 14, which Metro Health now has moved to dismiss, D. 15. The Court has considered the motion papers, D. 15-16, and opposition to same, D. 19, in resolving this motion.

### V.  Discussion

#### A.  Breach of Contract

##### 1.  Amwell Has Failed to State a Claim for Breach of Quotation # Q-07772-2 (Count I)

Metro Health contends that Amwell does not have an "actionable claim for breach of contract with regard to Quotation Q-07772-2" because Amwell had "terminated the quotation before its term had run" and that at the point of termination, Amwell "ha[d] received all the money owed to it, *and more*." D. 16 at 7 (emphasis in original).

---

[2] In light of the motion to dismiss the amended complaint, D. 15, the Court DENIES the earlier motion to dismiss the original complaint, D. 10, as moot.

"To state a breach of contract claim, '[the] plaintiff[] must [allege plausibly] that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff[] sustained damages as a result of the breach.'" Lexington Ins. Co. v. Johnson Controls Fire Prot. Ltd. P'ship, 347 F. Supp. 3d 61, 65 (D. Mass. 2018) (quoting Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007)).

As alleged, pursuant to Quotation # Q-07772-2, Metro Health was obligated to pay Amwell a total of $41,000 for Amwell's "Amwell Quick Connect" product. D. 14 ¶ 14, 18; D. 14-1 at 2. The cost includes both a one-time payment of $5,000 for associated provisioning and training and an annual fee of $12,000 to be paid over the course of three years and to be "invoiced on each anniversary of the quote execution date during the term." D. 14 ¶ 19; see D. 14-1 at 2-3. Because Quotation # Q-07772-2 requires payments to be made in installments, D. 14-1 at 3, it is to be construed as an installment contract. See Allan R. Hackel Org., Inc. v. Am. Radio Sys. Corp., No. 98-0335, 2000 WL 281689, at *2 (Mass. Super. Jan. 12, 2000) (characterizing the contract at issue as an installment contract because it "was not to be completed at one time, but over time and in separate parts").

In breach of contract cases involving installment contracts, courts in Massachusetts have relied upon Restatement (Second) of Contracts § 243(3). See Davis v. Dawson, Inc., 15 F. Supp. 2d 64, 136 (D. Mass. 1998); Clark v. Trumble, 44 Mass. App. Ct. 438, 445 (1998). Pursuant to the Restatement, "[w]here at the time of the breach the only remaining duties of performance are those of the party in breach and are for the payment of money in installments not related to one another, his breach by non-performance as to less than the whole, whether or not accompanied or followed by a repudiation, does not give rise to a claim for damages for total breach." Restatement (Second) of Contracts § 243(3) (1981). In other words, each installment gives rise to an independent cause of action and the failure to pay one installment does not give rise to a breach of

contract claim for a separate installment.  See McNamara v. City Of Nashua, 629 F.3d 92, 96 (1st Cir. 2011) (noting that if the plaintiff's pension "represents an 'installment contract,' . . . a claim based on underpayment could arise separately with each alleged pension payment"); see also Restatement (Second) of Contracts § 243(3) (1981), illustration 4 (stating that if A borrows from B and promises to repay in ten installments but fails to pay the first four, B has a breach of contract claim against A only for those four installments).

Here, as of the date of the termination of Quotation # Q-07772-2 on September 30, 2024, Metro Health, through the FCC's contribution, had paid a total of $34,850.  D. 14 ¶ 26.  This amount satisfies and, as Metro Health points out, exceeds the total amount of the first two installments for which it was expected to pay at this point.  D. 16 at 8-9.  Moreover, given that Amwell terminated Quotation # Q-07772-2 months before the final installment was to be paid, D. 14 ¶¶ 14, 19, 62, not only is there no breach as to the later installment, but it is not clear how Amwell is entitled to receive payment for a third year of service that had not yet come due.  See D. 16 at 10.  Given that there is no pending installment due, Amwell cannot state a claim for breach of Quotation # Q-07772-2 here.

Nevertheless, Amwell argues that it has plausibly pleaded a breach of contract claim for Quotation # Q-07772-2 because "nothing in the Amended Complaint or its exhibits support Metro Health's presumption that the FCC's partial payment of Invoice #INV63221A[3] relieved Metro

---

[3] Metro Health argues that "[t]he only possible avenue for Amwell to argue that it might be owed for services it never provided is to redirect the Court to consider a different document as controlling, and to rely upon a January 30, 2023 invoice [Invoice # INV63221A] as setting forth the terms of agreement between the parties."  D. 16 at 9.  Metro Health further contends that "a unilateral post-hoc invoice or letter cannot supersede the terms of a bilateral agreement."  Id.  Although Amwell disputes this contention, D. 19 at 11, it "may not . . . use [its] opposition brief to add new facts that [it] failed to plead in [its] [amended] [c]omplaint."  Gordon-Johnson v. Clinical & Support Options, Inc., No. 24-cv-40050 MRG, 2025 WL 509502, at *5 (D. Mass. Feb. 14, 2025).  For at least these reasons, Amwell's position does not warrant a different outcome at to Count I.

7

Health of having to pay" the remaining 15% of the total cost of the Quotation. D. 19 at 11-12. As discussed, this 15% figure comes from the alleged agreement between the FCC and Metro Health whereby the FCC agreed to pay 85% of the total cost of the Quotation if Metro Health agrees to pay the remaining 15%. D. 14 ¶ 26. "It goes without saying that a contract cannot bind a nonparty." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294 (2002). By extension, non-parties are generally barred from enforcing a contract with some narrow exceptions, none of which is alleged here. See Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 12 (1st Cir. 2014) (stating that nonparties may enforce a contract only through "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel") (quoting Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009)). Consequently, because Amwell is not party to this agreement and given the analysis above that Amwell is not due any further installment, there is no basis to compel Metro Health to pay any alleged remainder of Quotation # Q-07772-2.

For the reasons discussed, the Court allows the motion to dismiss as to Count I.

## 2. Amwell Has Plausibly Alleged a Claim for Breach of Quotation Q-08499-1 and/or the MSA (Count II)

Metro Health asserts that because "Amwell's Count II . . . relies upon incorporation by reference despite there being no such reference in either" Quotation # Q-08499-1 or the MSA the claim must therefore fail. D. 16 at 4. As an initial matter, this argument ignores Amwell's allegation that Quotation # Q-08499-1 "is a valid and enforceable contract in its own right," D. 14 ¶ 75, and it has plausibly alleged the requisite elements of a contract. Id. ¶¶ 72, 74-80. Thus, even assuming *arguendo* that incorporation by reference is absent here, Count II remains viable because Metro Health is still bound by the terms of the Quotation.

Putting that aside, Metro Health's argument that Amwell has failed to allege plausibly that the MSA incorporates by reference Quotation # Q-08499-1 is unsupported. "In order for terms to

8

be incorporated into a contract by reference, 'the document to be incorporated [must] be referred to and described in the contract so that the referenced document may be identified beyond doubt.'" Schacter v. Cir. City Stores, Inc., 433 F. Supp. 2d 140, 143 (D. Mass. 2006) (alteration in original) (quoting Lowney v. Genrad, Inc., 925 F. Supp. 40, 47 (D. Mass. 1995)). In other words, "the language used in a contract to incorporate extrinsic material by reference . . . must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g. as background law or negotiating history)." NSTAR Elec. Co. v. Dep't of Pub. Utilities, 462 Mass. 381, 394 (2012) (quoting Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1345 (Fed. Cir. 2008)).

     Here, the MSA and Quotation # Q-08499-1 incorporate each other by reference. Under the MSA, Metro Health is required to "pay Amwell in accordance with the terms of the Ordering Document," D. 14-4 at 3, which includes "quotation[s], Statement of Work or order form that (i) incorporates the MSA by reference, (ii) is executed by the parties hereto and (iii) set forth the Services and/or Professional Services purchased[,]" id. at 2. These requirements are met in Quotation # Q-08499-1, which both references the MSA in the "Governing Agreement(s)" section, is signed and executed by the parties, and set forth the services purchased. D. 14-5 at 2-5. Read together, the language used in both the MSA and the Quotation communicate a purpose of incorporating "the referenced material into the contract." NSTAR Elec. Co., 462 Mass. at 394 (quoting Northrop Grumman Info. Tech., Inc., 535 F.3d at 1345).

     Metro Health acknowledges that the MSA might have been referenced in the "Governing Agreement(s)" section of the Quotation but argues that there is no incorporation because there is a blank for the date of the MSA there. D. 16 at 11-12. The relevant section states, "[t]he software and software-as-a-Service (SaaS) products and related services listed in this Quotation . . . are

9

subject to the terms and conditions of (i) the master service agreement between Customer and American Well Corporation ("Amwell") dated on or about____(the "MSA")[.]" D. 14-5 at 4.  As discussed, incorporation by reference is generally accomplished so long as the contract "clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract." NSTAR Elec. Co., 462 Mass. at 394 (quoting Northrop Grumman Info. Tech., Inc., 535 F.3d at 1345).  Although Metro Health may have a better argument at summary judgment or trial, at least for the purposes of plausibly stating a claim, Amwell has done so here as to the language in both the MSA and as to Quotation # Q-08499-1.

To the extent that Metro Health contends that Count II also fails because Amwell has failed to allege its own performance "[s]ince it did not plead any facts to suggest it provided any goods or services – and the documents themselves are silent as to what exactly Amwell was required to do," D. 16 at 12, Amwell has sufficiently plead facts as to same.

Metro Health cites that in a claim for breach of contract, Amwell must allege plausibly that it has "adequately performed under the contract," Debnam v. FedEx Home Delivery, No. 10-cv-11025-GAO, 2011 WL 1188437, at *1 (D. Mass. Mar. 31, 2011) (citing Persson v. Scotia Prince Cruises, Ltd., 330 F.3d 28, 34 (1st Cir. 2003)), aff'd, 766 F.3d 93 (1st Cir. 2014), i.e. providing the services described in the Quotations and the MSA.  That said, at this stage of the pleading, "this Court must draw all reasonable inferences in [Amwell's] favor." Lexington Ins. Co., 347 F. Supp. 3d at 65 (citing Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009)).  Here, Amwell has incorporated the parties' various agreements and alleged that it performed its duties thereunder, D. 14 ¶ 77, and engaged in negotiations with LCA Vantage, the entity that acquired Metro Health, to pay the outstanding invoices.  D. 14 ¶ 60.  Viewed in the light most favorable to Amwell, this is sufficient for the pleading stage.

Metro Health's citation of Soo v. Bone Biologics Corp., 19-cv-11520-ADB, 2020 WL 4673521, at *5-6 (D. Mass. Aug. 12, 2020), to argue that the law requires Amwell to plead facts that can "explain what they actually did to comply with the terms of the contract," D. 16 at 13, does not warrant a different outcome. Soo involved a dispute over an employment contract which allegedly provided a stock option payment plan that would vest immediately if the defendant terminated the plaintiffs without cause. Soo, 2020 WL 4673521, at *4. The defendant claimed that it terminated the plaintiffs for cause because the plaintiffs had allegedly breached the contract at issue. Soo, 2020 WL 4673521, at *4. The court held that to contest that claim, "the [p]laintiffs need to plead specific facts to show they completed, or at least attempted to complete, their contractual obligations," id. at *5, which was not about their performance, but whether they had plausibly alleged a breach of contract by the defendant (i.e., termination without cause which would trigger the stock option payment plan). By contrast here, Amwell has sufficiently alleged the elements of a breach of contract claim regarding Quotation # Q-08499-1 and/or the MSA as addressed above.

For all of these reasons, the Court denies the motion to dismiss as to Count II.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS the motion to dismiss as to Count I but DENIES the motion as to Count II. D. 15. Additionally, in light of the Court's order allowing Metro Health's counsel's motion to withdraw as attorney, D. 25, and now having resolved this motion to dismiss, Metro Health's new counsel shall file a notice of appearance no later than July 22, 2025.

**So Ordered.**

/s Denise J. Casper
United States District Judge